## MATTER OF SOLOMON

### In Disbarment Proceedings

### A-17690345

*Decided by Board February 10, 1977*

(1) The standard of proof in suspension or disbarment proceedings under 8 C.F.R. 292.3 requires that allegations of misconduct be established by clear, convincing, and unequivocal evidence.

(2) Where a comprehensive witness list was made available to the respondent, and where respondent's request for discovery was granted and fulfilled, the Board of Immigration Appeals found no prejudicial error or impropriety in the immigration judge's denial of a continuance before and at the commencement of the disbarment hearing.

(3) Where the interpreter in deportation proceedings is an employee of the Immigration and Naturalization Service, that person nee d not be sworn to interpret and translate accurately because he is acting under his oath of office; however, in this disbarment case the Service interpreter was, in fact, sworn, and counsel had an opportunity to bring in an outside interpreter, and the Board of Immigration Appeals found no merit to respondent's objection to the use of the Service interpreter.

(4) Where the only evidence bearing on the charge under 8 C.F.R. 292.3(a)(3) was the alien's testimony that he received a "call-in letter" from the Service requesting an interview and that he gave that letter to the respondent who stated to him that he would represent the alien and told him to stay at home; and the "call-in letter" which contained the notation, "Mr. Solomon will bring in," the Board of Immigration Appeals concluded that there was insufficient evidence to sustain the charge that the respondent willfully misled, misinformed, or deceived any officer or employee of the Department of Justice concerning any fact, material and relevant or not, in connection with this case.

(5) Where the respondent, an attorney, failed to take the necessary action to obtain an immigration visa for his alien client while informing him that he had done so; advised the alien to ignore "call-in letters" issued by the Immigration and Naturalization Service and failed to represent the alien in answer to the "call-in letters"; and these were contributing factors in the initiation of deportation proceedings and the existence of an outstanding order of deportation, the Attorney General and the Board of Immigration Appeals concluded that by clear, convincing, and unequivocal evidence the respondent had violated 8 C.F.R. 292.3(a)(4) (Charge #6) by willfully deceiving and misleading his client in a "matter relating to the case" and that such conduct warranted suspension from practice.

(6) As to allegations of attorney misconduct charged under 8 C.F.R. 292.3(a)(3) and (4) (Charges #1-5, 7), the Attorney General and the Board of Immigration Appeals concluded that the Immigration and Naturalization Service had failed to meet its burden of proof by establishing the alleged acts of misconduct by clear, convincing, and unequivocal evidence.

ON BEHALF OF RESPONDENT:
Esther M. Kaufman, Esquire
Room 914, Woodward Building
15th & H Streets, N. W.
Washington, D. C. 20005

COUNSEL OF RECORD:
Franklin D. Kreutzer, Esquire
Meyer M. Brilliant, Esquire
Michael Reichman, Esquire
3041 N. W. 7th Street, Suite 100
Miami, Florida 33125

ON BEHALF OF SERVICE:
George Indelicato
Appellate Trial Attorney

BY: Milhollan, Chairman; Wilson and Torrington, Board Members; Board Member Appleman, Concurring; Board Member Maniatis, Dissenting.

This case is before us pursuant to the provisions of 8 C.F.R. 292.3(b) and Recommendation in Disbarment Proceedings of the Regional Commissioner of the Immigration and Naturalization Service. At the outset we feel constrained to comment on the state of the record in this case, which we find to be disappointingly deficient. First, the Immigration and Naturalization Service has sought to charge the respondent under specific numbered subsections of the regulations, yet in some instances the descriptive language of the charges adds information totally irrelevant to the charge as stated in the regulation. Our deliberations are necessarily confined to the allegations of violations as expressed in 8 C.F.R. 292.3(a)(3) and (4) under which the respondent is charged. We have not considered any other irrelevant accusations which may have been made against the respondent in the descriptive language of the complaint, at the hearing, or elsewhere.

Secondly, we have been hindered by the failure of counsel for the Service and for the respondent to introduce into evidence affidavits and documents, some of which were referred to at the hearing, which might have been helpful to us in determining the facts and evaluating the credibility of the witnesses.

Finally, we have been hampered by the lack of follow-through in the questioning of the witnesses, which resulted in gaps in the testimony and consequently in failure to resolve many crucial questions one way or the other.

In disbarment proceedings under 8 C.F.R. 292, before discipline may be imposed, any allegations of misconduct must be established by evidence which is clear, convincing, and unequivocal. *Matter of Koden,* [1]

---

[1] The decision in *Koden* was not yet final at the time of the hearing. The case had been decided by the Board and was still before the Attorney General on certification pursuant to 8 C.F.R. 292.3(b). The final decision was rendered by the Attorney General on July 22, 1976, and the case was then designated for publication.

Interim Decision 2516 (BIA 1974; A.G. 1976; BIA 2516 August 16, 1976). This burden of proof is the key to this case. With regard to several of the charges, some evidence gave indications of wrongdoing, but because of failure to pursue a potentially enlightening line of questioning, or because of our doubts concerning the credibility of the witnesses—even, in some cases, where the respondent offered little or no defense other than a denial—we were simply unable to determine that the "clear, convincing, and unequivocal evidence" standard of proof had been satisfied. It was up to the Service to resolve our doubts, and in those instances it failed to do so. As a result we have found the charges sustained only as to charge six.

The respondent is an attorney who has been admitted to the bar of the State of Michigan and who has also been admitted to practice before the United States Courts of Appeals for the Third, Sixth, and Seventh Circuits and possibly for the Second Circuit as well. He has practiced immigration law almost exclusively since World War II, and began to practice immigration law in Dade County, Florida, in 1957, where he still practices.

This disbarment proceeding was commenced on October 15, 1974, when the respondent was personally served both with a complaint, entitled Notice of Proposed Disbarment Proceedings, specifying the conduct which the Immigration and Naturalization Service alleged constituted grounds for discipline, and with a Notice to Show Cause why a motion seeking his disbarment should not be made to the Board of Immigration Appeals.

The respondent, through counsel, answered the complaint by stating that he was the subject of an investigation by the State Bar Grievance Board of Michigan on the basis of allegations similar to those involved in this disbarment proceeding, and moved that this proceeding be held in abeyance pending completion of the Michigan investigation; in the alternative, he denied all of the allegations of misconduct and requested a hearing on the charges. The motion to suspend proceedings was denied. The respondent's subsequent motion to take depositions was granted on February 25, 1975.

A Request for Discovery and Motion to Take Depositions was made by the Immigration and Naturalization Service on April 4, 1975. The Service requested a complete list, to be produced by the respondent, of all witnesses that were to testify in the respondent's behalf, statements made by those witnesses to the respondent, and the right to take depositions of those witnesses. The Service also requested that the respondent produce his files relating to the persons named in the Notice of Proposed Disbarment Proceedings. The immigration judge granted the ex parte request and the motion by telephone on April 4, 1975. The trial attorney for the Service also indicated, in a letter to the respon-

dent's counsel dated March 31, 1975, his intention to depose the respondent if the latter were going to testify at the hearing.

Depositions were taken by the respondent's counsel on April 3, 4, 7, and 8, 1975. The Service also provided the respondent with scores of pages of documents.

The hearing was scheduled to begin, and did begin, on April 15, 1975. Prior to the beginning of the hearing, and at its commencement, counsel requested a continuance so that he might have time to have the depositions transcribed and to study them and the great number of documents which the Service had produced. Otherwise, he argued, the grant of discovery was an empty right. Counsel objected to the fact that one Service witness would not be (and actually was not) available to be deposed until one day before the hearing. He further strenuously objected to the immigration judge's grant of the Service motion for discovery and depositions, declaring that it was a violation of the respondent's constitutional privilege against self-incrimination. Counsel moved that new counsel for the Service and a new trial judge be appointed and sought a continuance. These motions were all denied. Before the Board, counsel again raised the issue of sufficient time to take advantage of the grant of discovery.

When the trial attorney provided a list of the witnesses the Service intended to call and offered documents relating to this case, he indicated (Exhibit 11) that this Board in *Matter of Koden, supra*, had held that in a disbarment proceeding there was no prejudicial error in the denial of the respondent's request for a list of Service witnesses and for discovery when, at the final hearing, ample opportunity was afforded the respondent to cross-examine all witnesses.

As we stated in *Matter of Koden, supra*, "[t]he respondent, through his counsel, was afforded ample opportunity to cross-examine the available witnesses against him. The evidence against him was fully disclosed, and he was not denied a reasonable opportunity to defend on the charges levied in the complaint." In *Koden* we concluded that, although the respondent may have been inconvenienced by the denial of discovery and by lack of knowledge of the witnesses the Service intended to produce, there was no discernible prejudicial error in the denial. *A fortiori*, in this case, where a comprehensive witness list was made available to the respondent, and where his request for discovery was granted and fulfilled, we find no impropriety in the immigration judge's denial of a continuance before and at the commencement of the hearing. In any event, there was no prejudicial error.

Concerning the Service's request for discovery, in view of the fact that the Service, perhaps persuaded by counsel's subsequent objections, did not insist that the immigration judge's order be obeyed, and since the respondent objected to the grant of the motion for discovery and

391

was not deposed and did not produce a witness list or any documentary evidence in obedience to that order, we find that if there was error, it was not prejudicial to the respondent.

Whenever the Service interpreter was asked to interpret for a witness, counsel for the respondent objected to the use of a Service employee for this purpose, stating that the Service should provide an impartial outsider to perform that function. The interpreter's qualifications were not called into question, nor would counsel formally accuse her of being biased. When the original objection was made, the trial attorney invited counsel to produce an additional outside interpreter at no expense to the Government. Counsel did not wish to do this. The immigration judge overruled the objection, stating that under similar circumstances in deportation cases Service interpreters are used as a matter of course.

The regulations provide for the use of an interpreter in deportation proceedings. 8 C.F.R. 242.12. If the interpreter is not an employee of the Service, that person must be sworn to interpret and translate accurately. However, if the interpreter is an employee of the Service, no such oath need be taken, evidently because the employee is acting under his oath of office. *Couto* v. *Shaughnessy*, 218 F.2d 758 (2 Cir. 1955), *cert. denied*, 349 U.S. 952 (1955). In the present case the interpreter, though a Service employee, was sworn. The record contains no allegations and no evidence of any lack of understanding between the interpreter and the witnesses.

In view of the fact that the interpreter was sworn and that counsel did not avail himself of the opportunity to bring in an outside interpreter to check the Service interpreter, we find no merit in counsel's objection to the use of the Service interpreter in this proceeding.

There are seven numbered charges of misconduct in the complaint (Exhibit 1). All are predicated upon the respondent's alleged violation of 8 C.F.R. 292.3(a)(4), which provides, in pertinent part, for the suspension or disbarment of an attorney or representative "[w]ho willfully deceives [or] misleads . . . any party to a case concerning any matter relating to the case. . . ." The fifth and sixth charges are also predicated upon the respondent's alleged additional violation of 8 C.F.R. 292.3(a)(3), which provides for the suspension or disbarment of an attorney or representative "[w]ho willfully misleads, misinforms, or deceives an officer or employee of the Department of Justice concerning any material and relevant fact in connection with a case. . . ."

*CHARGE #1*

The first charge in the complaint, which alleges a violation of 8 C.F.R. 292.3(a)(4), contains allegations that the respondent was retained by Dagoberto Castillo-Melo and Elbicia Graciela Moller de Castillo, natives

and citizens of Chile who are husband and wife, to obtain lawful permanent resident status for them; that he accepted fees from them; and that he failed to represent them adequately both with regard to maintaining their nonimmigrant status, and in connection with any applications for immigrant visas. It is further alleged that the respondent repeatedly assured the Castillos that they had nothing to worry about and that they had applications pending before the American consul in Toronto, Canada, when no such applications had actually been accepted for processing in Toronto. Finally, the complaint characterizes this advice and information as misleading and deceiving, and states that the Castillos relied on it to their detriment.

Mr. Castillo testified at the proceedings that he retained the respondent on June 19, 1972, in order to get legal extensions of his temporary stay and to obtain lawful permanent resident status. Before retaining the respondent, Mr. Castillo had applied for a labor certification. He stated that he had informed the respondent about this. Mr. and Mrs. Castillo became the parents of a United States citizen child on September 2, 1972, less than three months after they had originally retained the respondent to assist them.

Mr. Castillo stated that he had agreed to pay the respondent $1,000 for lawful permanent resident status for both himself and his wife. Canceled checks corroborate his testimony that he actually did pay $350. On cross-examination it was brought out that Mr. Castillo had agreed to pay the balance of the $1,000 in December 1972 but that he had not paid anything beyond the $350.

Mr. Castillo testified that he had visited or spoken with the respondent approximately once a week concerning his case, and that the respondent had told him that he had an open file in Toronto, that everything was ready for him to get his visa, and that it was just a matter of time. The respondent denies having made such statements or given such assurances.

In June 1973 Mr. Castillo contacted the American consulate in Toronto by telephone and was told that there was no file in his name. The absence of a file was corroborated by the American consul herself, Ms. Eleanor Ridge, who testified at the proceeding that she had performed a thorough search, which revealed that there was nothing there relating to the Castillos.[2] However, the absence of a record at the consulate does not necessarily mean that no application was ever submitted or that there has been no correspondence concerning a given case. It means only that the application did not meet the criteria for acceptance for processing. An incomplete or otherwise unacceptable application

[2] She also testified that her files contained nothing relating to Mr. & Mrs. Muniz (charge #2), Mr. Georges (charge #3), Mr. & Mrs. Zunino (charge #4), or Ms. Olivares (charge #7). There was an approved visa petition on file relating to Mr. Hidalgo (charge #6).

would be returned to the sender, and no record would be made for the applicant.

At the time any application would have been made for the Castillos, Toronto was no longer accepting for processing applications made by alien parents of United States citizen children under the age of 21 if the parents were not former residents of Canada, with certain exceptions. If the alien parents had been from Chile and had claimed that they would suffer persecution if they had to return to Chile to make their visa applications, the consulate general would have made a determination as to whether or not the persecution claim was a valid one. If an asylum request had already been denied and this was known in Toronto, the visa application would not have been accepted. However, ordinarily it was not known in Toronto whether requests for asylum had been denied or not.

Mrs. Castillo for the most part corroborated her husband's testimony as stated above.

The record indicates that both Mr. and Mrs. Castillo were out of status when they retained the respondent. Mr. Castillo's I-94, Arrival-Departure Record, shows his admission as a B-2 visitor on December 12, 1968, a change of status to that of an F-1 student on March 12, 1969, and several extensions of stay through February 2, 1972 (Exhibit 19). He stated that he was working when he retained the respondent. A call-in letter (Exhibit 21) shows that Mr. Castillo was required to depart from the United States by May 6, 1972. Three extensions of voluntary departure were then authorized, the first obtained by Mr. Castillo himself, and the other two evidently by the respondent.

A note dated November 3, 1972, and signed by the respondent describes Mrs. Castillo and contains a photocopy of the reverse side of her Form I-94 indicating extensions of stay at least through December 14, 1971 (Exhibit 22). The note states that Mrs. (or perhaps Mr.—it is not clear which) Castillo was a Chilean refugee. Whether the term "refugee" described her official immigrant status or merely her way of thinking of herself is not shown. The note also states that she is the mother of a newborn baby.

The respondent denied telling the Castillos that they had nothing to worry about, though he concedes he may have said, after obtaining an extension of voluntary departure, that there was nothing to worry about for the time being, but that they should see him again before the particular extension was to run out. He said that he felt he had fulfilled his obligation to them by obtaining extensions of voluntary departure; he told them there was no way they could stay in the United States permanently, but he kept them here lawfully as long as he could. At the hearing he did not recall that they had a United States citizen child, despite the fact that Exhibit 22 indicates that he was aware of this. Still

he stated that he had filed papers for them in Toronto, but he offered no copies of any such papers from his files. He may have filed a visa application or a Form FS–497A, Preliminary Questionnaire to Determine Immigrant Status[3], for Mr. Castillo, but, regrettably, that form is not included in the record.[4]

Mr. Castillo's testimony contains some contradictions and evidence of hostility, which cast some doubt on his credibility. In an interview held on July 2, 1973, by a Service investigator, at which a statement was taken, Mr. Castillo was evidently asked whether he had ever signed any application for the respondent to send to Toronto and answered, "No, never." At the proceeding, before being confronted with this statement, he admitted having signed some papers for the respondent relating to a visa. After being shown his earlier statement, which, unfortunately, was not introduced into evidence, he affirmed the truth of what he had said in that statement. He explained the apparent discrepancy by saying that while he had signed a paper relating to his visa, he did not have any idea that it was going to be sent to Toronto. Therefore, he could not answer yes to a question as to whether he had ever signed any application for the respondent to send to Toronto. We are not convinced by this explanation.

On the question of his extensions of stay, Mr. Castillo stated that he had obtained the first of three extensions for himself, and that after he had retained the respondent, the latter obtained one extension for him. It was only most reluctantly and under cross-examination that he admitted that the respondent had obtained two extensions of stay for him.

In addition, on the subject of his asylum claim, Mr. Castillo testified at the hearing that he was a member of the National Party in Chile and denied being a member of the "Followers of O'Higgins," whereas the District Director stated in his letter to the Office of Refugee and Migration Affairs of the Department of State, in connection with an earlier asylum claim, that Mr. Castillo had claimed to be a member of the "Followers of O'Higgins." (Exhibit 43) Mr. Castillo said that the statement in the District Director's letter was a mistake.

On balance we question the credibility of Mr. Castillo's testimony. Accordingly, we find that the Service has failed to sustain its burden to

---

[3] There is a reference in the transcript (Part I, pp. 73–75) to a notice which Mr. Castillo received from the American Consul in Toronto indicating that a visa application or preliminary questionnaire had been filed. It appears to have been dated June 26, 1973 (Tr. Part I, p. 74), only three days before the respondent returned all of Mr. Castillo's papers to him and their attorney-client relationship was terminated.

[4] At oral argument counsel stated that the form was returned to Mr. Castillo stamped TRT42A, see infra, and dated June 26, 1973. However, as counsel below objected to the introduction of this document into evidence, with the result that it was not introduced, it is not before us, and we do not consider it.

establish by evidence which is clear, convincing, and unequivocal that the respondent willfully deceived or misled the Castillos concerning any matter relating to their case.

### CHARGE #2

The second charge in the complaint, which alleges a violation of 8 C.F.R. 292.3(a)(4), contains allegations that the respondent was retained by Jose Ramon Muniz-Lyon and Maria Lucia Berguecio-Marin, husband and wife and natives and citizens of Chile, to obtain lawful permanent resident status; that he accepted fees from them; and that he failed to represent them adequately either with regard to their nonimmigrant status or in connection with any applications for immigrant visas. It is further alleged that the respondent repeatedly assured Mr. and Mrs. Muniz that they had nothing to worry about and that they had applications pending before the American Consul in Toronto, Canada, when no such applications had actually been accepted for processing in Toronto. Finally, the complaint states that Mr. and Mrs. Muniz relied on this advice and this information, which are characterized as misleading and deceiving.

Mr. Muniz testified at the hearing that he hired the respondent on January 27, 1972, in order to obtain lawful permanent resident status. He and his wife had a United States citizen child born on July 26, 1972. Mr. Muniz agreed to pay the respondent $500 for this service and actually did pay $250; he was to pay the rest upon receiving his lawful permanent resident status. He also paid an additional $125 for a "trip to Washington" concerning the visa application. According to Mr. Muniz, the respondent told him that it would take one-and-a-half to two years to obtain his residence. Sometime in 1973 the respondent allegedly told Mr. Muniz that he would be able to get his lawful permanent resident status in Toronto the following August or October.

After reading an article in a Miami newspaper which called into question the respondent's practices, Mr. Muniz asked the respondent for written assurance that he would get his lawful permanent resident status in August or October. At that time, according to Mr. Muniz, the respondent returned to him the Form FS–497A, Preliminary Questionnaire to Determine Immigrant Status, stamped April 5, 1973, and marked TRT42A, and told him the notation meant that the application had already been approved. Mr. Muniz then went to the Immigration and Naturalization Service office, where Officer George E. Tarrant informed him that the code meant that the application had *not* been approved.

At the time when Mr. Muniz first retained the respondent, he was under the impression that he had been granted political asylum. As it was brought out at the hearing, what probably happened was that he

applied for asylum at Service headquarters in April 1971 and was granted voluntary departure by April 12, 1972. He believed that this was a grant of political asylum until it was explained to him at the hearing that it was actually voluntary departure and not asylum. He stated that his wife had also been granted asylum when Salvador Allende was in power.

In August 1973, with the assistance of Officer Tarrant, Mr. Muniz filled out an application for a visa and sent it to Chile, where he was put on a waiting list. By the time of the hearing in this case he had still not procured a resident visa. Mrs. Muniz returned to Chile in December 1974, after the fall of Allende.

The respondent denied any wrongdoing in the Muniz case. He said that he had Mr. and Mrs. Muniz apply for visas in Toronto not because he thought they would be successful but because they would not go anywhere else. He said that he had requested them to make their applications in Chile but they had refused to do so. The respondent denied having said the notation TRT42A meant everything was all right. He said that he had given Mr. Muniz another paper (see Exhibit 42) along with the returned form, which explained that the form had not been approved.[5] The respondent did not remember precisely about the "trip to Washington" for which Mr. Muniz had paid him $125, although it sounded familiar. He stated that obviously $125 would not cover the trip, and that it would have been to see someone in the State Department concerning an asylum claim.

The core of the accusation concerning Mr. Muniz relates to the return of the Form GS–497A and the explanation given by the respondent. Mr. Muniz testified that the respondent told him it meant approval. However, Mr. Muniz was also quite sure that he had been granted political asylum when he had not been, and he was confused throughout his testimony about the dates on which various key events took place.

We are not convinced by the testimony of Mr. Muniz that the respondent told him that the code TRT42A meant approval when it actually meant disapproval. Since it is so easy to check with the Service and find out what that symbol actually means, as Mr. Muniz did, it seems highly unlikely that the respondent would have assured his client that it meant the opposite of what it actually meant. In addition, Mr. Muniz gave contradictory testimony concerning whether or not he had discussed political asylum with the respondent. At first he denied having discussed the matter (Tr. Part II, pp. 93, 97), but he later admitted that he had discussed asylum (Tr. Part II, p. 122). Moreover, because Mr.

---

[5] We note that there is no name, address, or signature on Exhibit 42. It is not clear, therefore, whether this is simply a sample, as it appears to be, or whether it was offered as the very piece of paper which the respondent allegedly gave to Mr. Muniz along with the returned Preliminary Questionnaire.

Muniz was so certain that he had been granted asylum when he had not been, it seems to us that he could have been similarly mistaken regarding what the respondent told him about his application. People often hear only what they want to hear, and when they are disappointed they may turn against someone who is a convenient target even though he may not be the cause of their disappointment.

Because we we are left with some unresolved doubts concerning the Muniz case, and because it is the burden of the Service to resolve those doubts, we find that charge #2 has not been established by clear, convincing, and unequivocal evidence.

### CHARGE #3

The third charge in the complaint, which alleges a violation of 8 C.F.R. 292.3(a)(4), contains allegations that the respondent was retained by Antoine G. Georges, a native and citizen of Haiti, so that he might obtain lawful permanent resident status; and that the respondent failed to represent him adequately either as to his nonimmigrant status or in connection with any application for an immigrant visa. It further alleges that the respondent accepted important nationality, immigration, and other documents from Mr. Georges and thereafter refused to return them to him even when repeatedly asked to do so. It is further alleged that the respondent assured Mr. Georges that he had nothing to worry about, although he had taken little or no action in behalf of his client while regularly accepting fees from him. The complaint characterizes this conduct as misleading and deceiving, and states that Mr. Georges relied on it to his detriment until he retained new counsel in August 1974.

Mr. Georges testified that he had last entered the United States as a nonimmigrant visitor on February 19, 1972. The record indicates that he has been in violation of his status since March 1972 (Exhibit 41, p. 4). He married a United States citizen on November 1, 1973, and retained the respondent on November 9 or 19, 1973, in order to obtain lawful permanent resident status. He agreed to pay the respondent $700 and actually paid him $510 in cash in several payments.

Mr. Georges gave the respondent his passport, Form I-94 (Arrival-Departure Record), his marriage certificate, his wife's divorce decree terminating a prior marriage, and her birth certificate. In August 1974, nine months later, Mr. Georges retained new counsel. He informed the Service of his change of counsel by letter and indicated on the letter that he had on several occasions asked the respondent to return his documents to him but that the respondent had refused to do so.

The record contains a sworn statement signed by the respondent. It is a question-answer interview before Officer Tarrant concerning a complaint by Mr. Georges that he had been unable to obtain his documents

from the respondent and that he had paid the respondent for services which were not rendered. At the time of the interview, the respondent turned over to Officer Tarrant Mr. Georges' passport, I-94, and marriage certificate, Mrs. Georges' birth certificate with the name of the child omitted, an amendment to correct errors on Mrs. Georges' birth certificate, Mrs. Georges' divorce decree, and some other documents. The respondent said in the statement that he had prepared a visa petition in behalf of Mr. Georges but had never filed it.

At the hearing the respondent indicated that he had tried on several occasions to contact Mrs. Georges because it was necessary to obtain a birth certificate which would be acceptable to the Service, and her birth certificate was defective in that her name was ommitted from it. He thought that she personally had to seek the correction. He said that Mrs. Georges was never home on these occasions and that Mr. Georges never knew where or how to reach her. Consequently, the respondent became suspicious that the marriage might be fraudulent. He said that he had prepared a visa petition, but because of his suspicions and his inability to contact Mrs. Georges, he did not in the nine months during which he represented Mr. Georges submit the visa petition to the Service.[6] No application for a visa was filed because the petition had not yet been approved.

Having retained new counsel, Mr. Georges is now the beneficiary of a visa petition which was approved on December 27, 1974.

On cross-examination Mr. Georges became angry when questioned about the validity of his marriage. He said that he was participating in this proceeding in order to get his money back, not to be a defendant. It is possible that the witness became defensive because he wanted to conceal a fraudulent marriage and did not expect to be questioned concerning his marriage at this proceeding. This could lend credence to the respondent's testimony. On the other hand, Mr. Georges described his courtship of his wife without hesitation and emphatically denied that he paid her to marry him or that he married her only to obtain immigration benefits. He denied categorically that the respondent had ever mentioned to him that he thought the marriage might be fraudulent.

The testimony and other evidence relating to this charge raise more questions than they answer. We must determine whether or not the respondent willfully misled or deceived Mr. Georges concerning his immigration case. The evidence shows that the respondent delayed the filing of a visa petition in Mr. George's behalf. The respondent says that

---

[6] The record does not contain a copy of the alleged visa petition, the amendment to correct errors on Mrs. Georges' birth certificate, or other documents relating to the Georges case. Hence, we cannot ascertain how much of the nine months was consumed in the preparation of the alleged visa petition or in attempting to procure a corrected birth certificate.

he made several efforts to contact the petitioner, Mr. Georges' wife, without success and that he grew to suspect the *bona fides* of their marriage. There is very little in the record to indicate what the respondent promised he would do.

Not having had the opportunity to observe the demeanor of the witnesses to aid us in determining credibility, we find that the respondent's handling of this case was ineffectual, but we cannot find that the Service has proved by clear, convincing, and unequivocal evidence that he willfully misled his client.

### CHARGE #4

The fourth charge, which alleges a violation of 8 C.F.R. 292.3 (a)(4), contains allegations that the respondent was retained and paid fees by Adolfo Bartolome Zunino-Riveros and Norma Estella Gomara-Caceres, husband and wife, so that they might obtain lawful permanent resident status; that they signed forms and gave the respondent their passports and immigration documents; and that the respondent assured them that there was nothing to worry about. It is further alleged that the respondent failed to represent them adequately either as to their nonimmigrant status or concerning any applications for immigrant visas; that he assured them that they had applications pending in Toronto, Canada, when no such applications were pending; and that this pattern continued until June 1973 when Mr. Zunino demanded the return of his documents. It is alleged that the respondent returned only the passport and asked for additional fees "for protection." The complaint characterizes this conduct as misleading and deceiving, and states that the Zuninos relied on it to their detriment.

Mr. Zunino, a native and citizen of Chile, testified that the respondent told him that he was going to obtain his lawful permanent resident status for him. Mr. Zunino paid $250 at the outset. Receipts were given on the back of the respondent's business card. Another $250 was to be paid when Mr. Zunino obtained his residence. Mr. Zunino further testified that the respondent had told him that he had sent his immigration papers to Toronto—including his fingerprints and photograph. They had many meetings, and, according to Mr. Zunino, at these meetings the respondent assured Mr. Zunino that his immigration papers were all in order. When Mrs. Zunino and their three children, all natives and citizens of Chile, arrived in the United States, their papers were also turned over to the respondent. Mr. Zunino stated that the respondent never asked for more money to arrange for the permanent residence of his wife and children. The only time he asked for more money was when Mr. Zunino requested the return of his papers. Then the respondent is alleged to have asked for an additional $100 "for protection" and to speed things up.

Before he sought the respondent's services, Mr. Zunino evidently had obtained several extensions of stay or of voluntary departure for himself merely by requesting the extensions at Service headquarters. Mr. Zunino stated that he had never discussed political asylum with the respondent because he had never been involved in politics.

Mrs. Zunino testified briefly. She said that while in this country she had worked in a factory as a sewing machine operator, in a laundry, and as a maid. She was asked about a recommendation from an employer in connection with the possibility of obtaining a labor certification.

Mrs. Zunino testified that she had received a written recommendation from her employer which had been shown to the respondent who had read the letter and returned it to her. Mrs. Zunino testified that she did not remember whether or not the respondent had made any comment about the possibility of obtaining a labor certification for her.

The respondent testified that he had not worked on a labor certification for either Mr. or Mrs. Zunino (Tr. Part VI, pp. 90–91). He also denied assuring them that they had pending applications in Toronto and that he had ever asked for additional money as "protection."

The evidence of record does not indicate any way in which the respondent could have obtained lawful permanent resident status for these aliens. No mention was made of any United States citizen or lawful permanent resident relatives; there was evidently no hope of obtaining a labor certification; and they made no request for political asylum. The respondent testified that there was no basis on which to file a visa application for them (Tr. Part VI, p. 34).

The respondent testified that none of the advice he had given to any of his clients was detrimental to them, because in every case he prolonged their stay in the United States, and it was to do that that they had retained him. He said that he used every tool and technicality at his disposal within the law and the code of ethics to keep his clients in the United States as long as possible.

In view of the fact that there was no discernible basis on which Mr. and Mrs. Zunino could seek lawful permanent resident status in the United States, we find it hard to believe that the respondent would have promised them that he would obtain that prize for them. The rejection of the employment letter would have been some indication to them that no such promise was made. We find it far likelier that he promised to do all he could to keep them in the United States as long as he could.

Accordingly, we find that the Service has not sustained its burden to establish charge #4 by clear, convincing, and unequivocal evidence.

*CHARGE #5*

The fifth charge originally alleged a violation of 8 C.F.R. 292.3(a)(3) and (4). In its memorandum on appeal and at oral argument the Service

conceded that the alleged violation of 8 C.F.R. 292.3(a)(4) had not been established. Therefore, we shall not consider the evidence adduced under that portion of the charge.

With reference to the portion of the charge relating to 8 C.F.R. 292.3(a)(3), it is alleged that the respondent was retained and paid fees by Freddy Arnoldo Pradenas-Zurita, a native and citizen of Chile; that Mr. Pradenas was furnished certain forms by the Service which he gave, along with his passport, to the respondent to complete; that Mr. Pradenas married a United States citizen and subsequently called the respondent repeatedly and demanded the return of his passport, with no response; and that this pattern continued until November 1973 when Mr. Pradenas and his wife went to the Service only to discover that little or nothing had been done on their behalf. It is concluded in the complaint that this "misleading and deceiving advice, information and inaction . . . worked to the detriment of officers of the Immigration and Naturalization Service who were obstructed in the performance of their duties."

The regulation provides for suspension or disbarment of an attorney or representative who "willfully misleads, misinforms, or deceives an officer or employee of the Department of Justice concerning any material and relevant fact in connection with a case. . . . " 8 C.F.R. 292.3(a)(3). The only evidence bearing on this charge in the record is testimony by Mr. Pradenas that he received a "call-in letter" (Exhibit 32) from the Service requesting an interview and that he gave the letter to the respondent, who said that he would represent Mr. Pradenas and told Mr. Pradenas to stay home. The call-in letter has a notation on it dated June 28, 1973, saying, "Mr. Solomon will bring in."

On the basis of this scanty evidence, we do not find that the respondent willfully misled, misinformed, or deceived any officer or employee of the Department of Justice concerning any fact, material and relevant or not, in connection with this case.

### CHARGE #6

The sixth charge, which alleges a violation of 8 C.F.R. 292.3(a)(3) and (4), contains allegations that the respondent was retained and paid fees by Mr. [Everado] Efraim Hidalgo-Caicedo to represent him in deportation proceedings, which he did; that in September and November 1972 Mr. Hidalgo received letters from the Service requesting that he appear for interviews, and in March 1973 a notice ordering him to appear packed and ready for deportation; that Mr. Hidalgo, on the advice of his counsel, the respondent, did not appear on any of these occasions; and that the same thing happened twice in May 1973. It is alleged that on these occasions the respondent told Mr. Hidalgo that he need not worry. It is further alleged that during this time the respondent assured Mr.

Hidalgo that an immigrant visa was being actively processed at the American Consulate in Toronto, Canada, when this was not true. In conclusion it is alleged in this complaint that the respondent's actions were misleading and deceiving, and were detrimental to Mr. Hidalgo and to officers of the Immigration and Naturalization Service, who were hindered and obstructed in the performance of their duties.

At this proceeding Mr. Hidalgo, a native and citizen of Colombia, testified that he had retained the respondent in January 1972, when he was detained by the Service and was faced with possible deportation. On that occasion he paid the respondent $250 to represent him at his deportation proceeding, which was held on January 28, 1972. Evidently Mr. Hidalgo was found deportable, released from custody, and granted six months voluntary departure, with an alternate order of deportation.

Mr. Hidalgo further testified that he had spoken with the respondent about helping him to obtain lawful permanent resident status, as his wife was a United States citizen. The respondent allegedly told him that his fee for that service would be $400, payable when Mr. Hidalgo received his resident visa. Mr. Hidalgo did not make any payments beyond the original $250. The record does not contain a visa petition filed on January 27, 1972, and approved on February 18, 1972, of which Mr. Hidalgo is the beneficiary.

Exhibit 37 consists of three call-in letters which the Service sent to Mr. Hidalgo with copies to the respondent. They are dated September 28, 1972, November 13, 1972, and March 12, 1973. The first two of the three ask Mr. Hidalgo to appear for an interview concerning his immigrant status, and the last one informs him that a final order of deportation has been entered and orders him to appear with baggage, ready for deportation. It is alleged that Mr. Hidalgo failed to appear on each of these occasions.

Mr. Hidalgo testified that each time he had received a "call-in letter" from the Immigration and Naturalization Service, he had telephoned the respondent. On those occasions the respondent arranged to meet him in the waiting room at Service headquarters. Each time, according to Mr. Hidalgo, the respondent assured him that everything was all right. Mr. Hidalgo himself never appeared before an officer of the Immigration and Naturalization Service on any of these occasions.

The respondent denied having told Mr. Hidalgo to disregard the notices sent by the Service. He said that he had met Mr. Hidalgo many times at Service headquarters and that each time, he, the respondent, had met with someone in the building. The respondent said that if he did not appear for Mr. Hidalgo, such an omission was unintentional and happened by mistake. Moreover, he denied having implied to Mr. Hidalgo that everything was all right permanently, although he admitted that he might have said, after meeting with a Service officer and

obtaining an extension of voluntary departure, that everything was all right for the time being.

The record does not show that the respondent appeared in Mr. Hidalgo's place and obtained extensions of voluntary departure for him; the November 13, 1972, letter, however, has a handwritten notation dated March 2, 1973, saying "Atty [sic] Solomon will bring in Monday." It also says "Failed to appear," but that notation is not dated and it is not clear whether it relates to March 2, 1973, or some other date.

Mr. Hidalgo testified that the respondent had told him that his papers had been sent to Canada and "were working," and that everything was all right; all he had to do was wait. Initially, according to Mr. Hidalgo, the respondent told him it would take 10 months to a year to get his visa. Then, when he received the last call-in letter, the respondent told him it would take about three or four weeks. Another witness, Mr. Jorge Sarmiento, corroborated Mr. Hidalgo's testimony, saying that he had heard the respondent tell Mr. Hidalgo that the papers "were working in Toronto and they were coming out fine." (Tr. Part IV, p. 80)

The record contains two photocopies of a Form FS–499, Immigrant Visa Control Card, relating to Mr. Hidalgo (Exhibits 26 and 36). Both show that Mr. Hidalgo was represented by the respondent, and that his immediate relative visa petition was filed on January 27, 1972, and was approved on February 18, 1972. Both show a notation concerning "PKT 3" dated March 8, 1972. The record does not, however, tell us what "PKT 3" is or what was done with it on March 8, 1972. Exhibit 26 is a copy of this card made at a later date. It shows the date July 17, 1973, in the box for "PKT 3," and also says "Sent US PKT 3 10/8/74 [sic]. . . ." This later version of the card also contains a notation dated July 25, 1973, indicating that Mr. Hidalgo was instructed to apply for permission to reapply for entry into the United States after deportation on Form I–212, and there is a later notation, dated January 8, 1974, which says "No need for permission. . . ." Unfortunately, these notations are not explained in the record. However, since Mr. Hidalgo allegedly went to the Immigration and Naturalization Service to inquire about his case in June 1973, it appears that Packet 3 was sent once when the respondent was still representing him, shortly after the visa petition was approved. It was sent to him twice more, and he was first instructed about the need to seek permission to reapply for admission to the United States after deportation after his attorney-client relationship with the respondent had terminated. We are puzzled by the notation that permission to reapply is no longer necessary, but are left with our puzzlement.

It appears to us that the respondent did represent Mr. Hidalgo adequately at his deportation hearing. Six months voluntary departure time is substantially greater than the average grant. Moreover, he did file a visa petition for Mr. Hidalgo. However, Mr. Hidalgo was married

404

to a United States citizen and was the beneficiary of an approved visa petition. In view of this fact, we find that the respondent's advice to Mr. Hidalgo that he not appear before the Service in response to several call-in letters, coupled with the respondent's failure to appear himself in behalf of Mr. Hidalgo on those occasions, was misleading to Mr. Hidalgo and worked to his detriment, creating the conditions for a final order of deportation to be entered against him, with the possible consequence of his being denied entry into the United States at a later time, unless he could obtain the permission of the Attorney General to enter.

Further, we find that the failure of the respondent to follow up the approval of the visa petition by complying with the instructions and completing the forms contained in Packed 3 [7], which were sent to him shortly after the visa petition was approved, and his failure to take any further action on the visa application for more than a year without explanation, as far as this record shows, while assuring his client that everything was in order for him to receive an immigrant visa, had the effect of misleading and deceiving Mr. Hidalgo.

Accordingly, we conclude that the charge under 8 C.F.R. 292.3(a)(4) has been sustained. However, we cannot determine from this record that any officer or employee of the Department of Justice was misled, misinformed, and deceived as to any material or relevant fact in connection with this case. Therefore, we hold that the charge under 8 C.F.R. 292.3(a)(3) has not been sustained.

*CHARGE #7*

The seventh and last charge, which alleges a violation of 8 C.F.R. 292.3(1)(4), contains allegations that the respondent was retained and paid fees by Aurora Olivares Oyarzun, a native and citizen of Chile, so that she might obtain lawful permanent resident status in the United States, and that he did not adequately represent her in that regard. It is further alleged that the respondent repeatedly assured Ms. Olivares that she had no problem, that her papers were in Washington, and that she would automatically acquire residence after two years in the United States, all of which was untrue. It is also alleged that despite repeated requests that the respondent return Ms. Olivares' papers to her, he refused to do so. Lastly, it is alleged that when Ms. Olivares was granted voluntary departure on or before February 20, 1974, the respondent advised her to ignore the notice. The complaint characterized all of the above advice and conduct as misleading and deceiving, and states that Ms. Olivares relied upon it to her detriment.

Ms. Olivares testified that she had retained the respondent to obtain lawful permanent resident status for her and that the agreed upon fee was $500, of which she had paid $420, twice by check and several times

---

[7] We infer that Packet 3 contains a visa application and other related forms.

in cash. She said that she had requested a receipt, but that the respondent had said a receipt was not necessary because he would write what she had paid in her file. Ms. Olivares stated that the respondent told her that he had sent her papers to Washington and that she would get her visa automatically in two years; all she had to do was wait. When she was questioned concerning her application for political asylum, she denied the truth of several statements she had evidently made in an interview with a Service officer, saying that the respondent had instructed her how to answer. The earlier statement is not part of this record.

Ms. Olivares received a notice from the Service ordering her to depart from the United States on or before February 20, 1974. When she informed the respondent about this, he told her that he would go with her to Service headquarters on that date. However, Ms. Olivares was alarmed by the notice because she did not have enough money to effect her departure by that date, so she went to the Service officer herself ahead of time and obtained a three-month extension. Ms. Olivares also stated that when she asked the respondent to return her passport and other papers, he told her that he could do so, but that then it would be her responsibility to take further action. She said that he did not return the papers.

The respondent denied that he had told Ms. Olivares that she would obtain her permanent residence automatically within two years. He said that there was no basis for her to apply for lawful permanent resident status. Concerning her asylum claim, he stated that she had provided him with all the information; clearly he could not have fabricated that story himself. He said that he had agreed to accompany her to the Service offices on the date specified in her notice from the Service, saying it was to her advantage to wait until the last moment. He denied refusing to return her papers and declared that indeed he had returned everything to her.

In our opinion, Ms. Olivares was not a credible witness. At the hearing she herself discredited an earlier statement she had made to a Service officer. She admitted making false claims to entitlement to political asylum.[8] We therefore conclude that charge #7 has not been sustained.

## CONCLUSION

Contrary to the opinion expressed by the Service Appellate Trial Attorney at oral argument, we have found that the evidence in these cases has not been overwhelming. The burden of proof, of course, rests upon the Service. In this case the Service has attempted to satisfy its burden through testimony and some documentary evidence. The re-

---

[8] Her request for political asylum was denied on December 12, 1973 (Exhibit 34).

spondent, for the most part, has simply denied the allegations against him, but has not offered any records to corroborate his testimony, such as copies of papers filed in behalf of his clients, or of letters to them describing actions taken, or confirming telephone conversations with them. However, some of his denials have been corroborated by the complaining witnesses themselves, and as noted, in other instances their testimony was neither credible nor convincing. It is within such a framework that we have arrived at our conclusions.

We have concluded that the allegations involving a violation of 8 C.F.R. 292.3(a)(4) in charge #6, involving Mr. Hidalgo, have been sustained.

The respondent established an attorney-client relationship with Mr. Hidalgo, represented him creditably in deportation proceedings, and filed a visa petition for him which was subsequently approved. Having created a relationship of confidence and trust, the respondent thereafter failed to follow through on his client's visa application but at the same time assured him that everything was in order for him to receive an immigrant visa. Moreover, he instructed his client not to appear in response to notices from the Immigration and Naturalization Service demanding his appearance, and by not appearing in his stead, the respondent created the conditions for a final order of deportation to be entered against Mr. Hidalgo, and thus jeopardized his chances to be readmitted to the United States to join his wife after deportation.

Having reached these conclusions, we believe that a six-month suspension from practice before the Immigration and Naturalization Service and before this Board is warranted.

ORDER: The respondent is suspended from the practice of law before the Immigration and Naturalization Service and before the Board of Immigration Appeals for a period of six months.

FURTHER ORDER: The record is certified to the Attorney General for final disposition, and the foregoing order is stayed pending such disposition.

CONCURRING OPINION: Irving A. Appleman, Board Member

This is not a case with which one can be comfortable. The Government's case is imprecise, despite 699 pages of testimony, and 44 exhibits. The Service is not aided here by any statutory mandate, such as the Immigration and Nationality Act places on an alien to show the time, place, and manner of his entry into the United States. In this disbarment proceeding the Government must supply the missing witness, prove the nonperformance or establish the misfeasance, or run the risk its case will fall—and there was a persistent failure to recognize this burden of proof.

Trial counsel for the respondent also bears a share of the blame.

Despite numerous procedural objections, on occasion he too failed to ask the necessary further questions of the witnesses, and to pursue the facts to their ultimate, in behalf of his client. In this, perhaps he has some excuse in the lack of supporting documentation from his client to establish the "what" and "when" of events. Solomon's office is in his home. He is a sole practitioner with no secretary. His "files," such as they are, by his own definition consist only of copies of forms filed in various places.

Not only do we not have the original complaints filed with the Service by the complainants, but we do not have the pretrial depositions which were taken from witnesses. Neither side sought to introduce these, for reasons not apparent in the record. Under the current procedure (happily now in process of change, see Federal Register, Volume 41, No. 211, November 11, 1976) we are called upon to determine credibility on a cold record, without having observed demeanor ourselves and without the evaluation of anyone who did. It would have been helpful to have had the complaints and depositions, but as it is we must decide the case on the record before us, and it is frequently inadequate.[1]

Some preliminary observations are needed. The procedural issues which have been raised are without merit. In the words of one court:

> Such [disbarment] proceedings are not law suits between parties litigant but rather are in the nature of an inquest or inquiry as to the conduct of the respondent. They are not for the purpose of punishment, but rather seek to determine the fitness of an officer of the court to continue in that capacity and to protect the courts and the public from the official ministration of persons unfit to practice. . . . The real question at issue in a disbarment proceeding is the public interest and an attorney's right to continue to practice a profession imbued with public trust. *In re Echeles*, 430 F.2d 347, 7 Cir. 1970.

While the respondent is entitled to procedural due process (*Bogart v. Carter*, 445 F.2d 321, 9 Cir. 1971; *In re Bogart*, Interim Decision 2465, A.G. 1976), and may even plead the Fifth Amendment (*Spevak v. Klein*, 385 U.S. 511, 1967), I know of no authority which assures him the full panoply of pleadings available in a criminal trial, or, for that matter, in an ordinary civil proceeding. The hearing covered a period, in all, of four days. No prejudicial error has been shown. On the contrary, the Government fully informed the respondent of the charges against him, made fully available to him the evidence in its files, and has demonstrated every effort to insure a fair hearing.

The homogeneous quality of the testimony of the Chilean complainants is disturbing. All were here in illegal status and were faced with deportation to Chile at the time they went to Solomon. The communist Government of Allende had come in power in Chile in 1970. He was not deposed until September 11, 1973. They came to Solomon during this period. Solomon seems to have deemed it his responsibility as an attor-

---

[1] It will be noted that the one charge sustained rests on documentary evidence, rather than the credibility of witnesses.

ney to keep them here as long as possible consistent with the law, and he so testified. Without question this was the desire of his clients as well.

An understandable reluctance to return to Chile could easily have influenced their conversations with Solomon, and could color their recollection of those conversations. Indeed, a refusal to admit unwillingness to return to Chile, as with the complainant *Zunino*, has to be viewed with some skepticism, and can reasonably be considered to reflect on the total credibility of the witness. The record indicates considerable tolerance on the part of the Immigration and Naturalization Service in not forcing these people to the point of actual deportation to Chile while Allende was in control. There is evidence that this policy changed after Allende was deposed. A natural, and perhaps inevitable, unhappiness over this change of position of the Immigration and Naturalization Service could account for some of the animus in the testimony of the complainants, directed at Solomon, and has to be weighed in evaluating their testimony.

Apart from these general observations, there are specific instances of inconsistency in the testimony, and inadequacies in the record, as pointed out in the majority opinion, and as supplemented below, which have led me to concur that the requisite clear, convincing, and unequivocal standard of proof has been met only as to Charge 6.

### Charge 1

Castillo entered the United States in December 1968 as a tourist, before Allende came to power. He met and married his wife in the United States. She too was a nonimmigrant visitor. Long before he came to Solomon on June 19, 1972, he was without status and illegally in the country. In fact he had already received a letter from the Immigration and Naturalization Service directing that he leave the United States on or before May 6, 1972. At least four months prior to coming to Solomon he had received some legal advice (Note Ex. 44 T. — Part I, pp. 85, 86) respecting his immigration status. His prior representative had made a telephone call to Toronto for him, apparently for information. Castillo had executed an application for a labor certification to assist in getting a visa and had also applied for political asylum. So far as known from the present record both of these applications were denied. He had been told by his prior counsel that it would take at least a year or 14 months to get a visa through the consulate in Toronto. Clearly, he did not approach Solomon with the naive innocence in immigration matters the Government would perhaps have us believe.

Apart from this, when Castillo came to Solomon he was faced with deportation to Chile at a time when the communists were still in control. He was so unhappy with the thought of returning to Chile that he even explored the possibility of getting a visa to Australia. At the very least

he was in a frame of mind where he could easily misunderstand, or misinterpret, anything told him with respect to his status in this country.

When Castillo talked to Solomon there was a discussion about the need for a labor certification. At the time Mrs. Castillo was pregnant. The child was born in the United States on September 2, 1972, and on October 13, 1972, at the time he gave Solomon a second check for $100, Castillo furnished Solomon the documents for a visa application, including a birth certificate relating to the child. The United States citizen child made it unnecessary for the Castillos to secure a labor certification. In view of the requirement of a labor certification, or proven exemption, before any consideration could be given anywhere to an application for a visa, a delay in processing the application was not unreasonable.

Castillo's admission that he filled out an application for an immigration visa at Solomon's direction, came most reluctantly and only under cross-examination. He had previously advised the Immigration Service, at the time he initiated his complaint, that no such application had been made. His unwillingness to admit that he had executed the application, reflects a possible disposition to "get" Solomon at all costs, even if it meant misleading the Service about work actually performed by Solomon.

Solomon's testimony that the application was sent to Toronto without any real hope of acceptance, must be read with the testimony given by Ridge, the Vice Counsel at Toronto, that visa applications by some Chilean refugees could possibly be accepted in Toronto. With even a mere possibility that Toronto might accept it, however unlikely, Solomon would have been remiss in not sending the application, particularly since his clients were unwilling to return to Chile for visas. The testimony of Ridge establishes that the application could have been sent and would have returned if unacceptable; that it was sometimes returned to the applicant, rather than to counsel; and that in either event there would have been no record whatsoever at the consulate. The absence of a record at the consulate in itself is not proof that no efforts were made in behalf of the Castillos.

In addition to assisting the Castillos with respect to applications for visas and sending them to Toronto, there is evidence that there were some 20 consultations with the clients, and that Solomon was also instrumental in securing two additional extensions of time within which to depart from the United States—without which, according to Tarrant, the Immigration and Naturalization Service investigator in the case, they would have been deported to Chile. Castillo showed the same curious reluctance to admit that Solomon had indeed secured the extensions for him.

The extensions of time to depart should not be confused with exten-

sions of lawful nonimmigrant status. The Castillos' lawful status had expired before they came to Solomon. Any portion of Charge 1 which relates to Solomon not acting ethically with respect to lawful nonimmigrant status is not applicable.

One is not impressed with the quality of proof on either side, but the burden is the Government's, and it is a substantial one. I am not satisfied that it has been met as to Charge 1. The Castillos not only got the extensions through Solomon, but had consultantions and visa application assistance, for which they paid, in all, $350.

For these reasons, as well as those stated in the majority opinion, the charge falls for lack of adequate acceptable evidence to meet the required burden of proof.

### Charge 2

Muniz is a thoroughly confused, and confusing, witness. Initially, he showed a disorientation on dates, but after several contradictory statements, it was resolved that he is a native of Chile who last entered the United States on January 29, 1971, as a nonimmigrant visitor. His wife also entered the United States as a nonimmigrant and was granted political asylum. She subsequently returned to Chile and resides there now with their United States citizen child, born July 26, 1972. They retained Solomon on January 27, 1972, and consulted with him about ten times. During this time he gave Solomon both passports, his daughter's birth certificate, and his marriage certificate.

Muniz denied that he told Solomon that he was interested in obtaining political asylum and testified at first that Solomon did not mention political asylum to him. He admitted that Solomon told him that he could not guarantee any success, that it would take between a year and a half and two years before he would be able to determine whether or not he would be able to stay. He stated with great firmness that he did not tell Solomon that he was afraid to go back to Chile, even though his family had lost five farms to the communists.

He then testified that he believed he had already been granted political asylum. In actuality the record establishes he had been given extensions of voluntary departure time, a quite different matter. Finally, and only under cross-examination, did he admit that he told Solomon that it was important that he not be required to go back to Chile; that he had problems in Chile and his family was having a real hard time, and he did not want to go back to Chile. Ultimately, and most reluctantly, he admitted that he distinctly remembered discussing political asylum with Solomon. Solomon's testimony was that he attempted to get political asylum for Muniz, and even made a trip to the Office of Refugee and Migration Affairs in the Department of State in Washington, in the alien's behalf.

Muniz also testified, again only under cross-examination, that

Solomon had shown him letters and all of the statements that he had sent to the consulate in Toronto, and told him at one time that it was hard to get "it" now and he was trying again; that he was told on one occasion that he was not being accepted; and that another application was filled out.

In the face of this testimony we are asked to believe that Solomon told him that the symbol TRT–42–A appearing at the top of his rejected visa application form, meant that his application had been accepted in Toronto, and that Solomon gave him back the form without the accompanying specific rejection letter from the consulate (See Ex. 42).

I have difficulty with this. Solomon testified that both forms were handed over to Muniz. It seems utterly incredible that, with the rejection of the form on its face, in symbols clearly understandable to Immigration and Naturalization Service officers, and to anyone else knowledgeable in immigration matters, Solomon would hand the form over saying that the application had been approved. If engaged in a fraud, as claimed, it seems far more logical that he would have retained this piece of evidence. That it was returned to Muniz, on the other hand, is consistent with Solomon's testimony that both forms were returned at the same time.

With respect to the futility of filing a visa application in Toronto, again one must refer to the testimony of the vice consul. As noted, according to Ridge there was at least a possibility that, as a claimed fugitive from Chile, an application by Muniz might be considered in Toronto. The labor certification requirement had been overcome by the birth of a United States citizen child. I do not believe that the Service has satisfactorily established any obvious exercise of futility in sending the application to Toronto. On the contrary, in view of the insistence of Muniz that the application go to Toronto, and not to Chile he would have been remiss in not sending it.

The United States citizen child was born on July 26, 1972. The birth certificate and other documents were then submitted to Solomon. In November 1972 he communicated with the consulate and there was a response. Ultimately, the application was filled out and resubmitted. It is stamped "Received" at the consulate on April 5, 1973. The rejection occurred thereafter. It would appear that during the approximate year or so that Solomon was retained by Muniz, substantial, if unsuccessful, efforts were being made towards obtaining a visa in Toronto.

In addition, as noted above, Solomon claimed to have made a trip to Washington to see someone at the Department of State with respect to Muniz's application for political asylum; he got an extension of stay for Mrs. Muniz; he appears to have secured extensions of time to remain in the United States for Mr. Muniz; and there were some ten consultations. For all of this he received the sum of $375.

In the light of this evidence, I cannot find that the Government has established either a misrepresentation or a detriment by the requisite burden of proof with respect to Charge 2.

As with Charge 1, it has not been shown that Muniz was in a bona fide nonimmigrant status at the time he was represented by Solomon or that there was any misrepresentation of any kind with respect to nonimmigrant status. That portion of the charge must also fall.

### Charge 3

Georges is a native and citizen of Haiti. It is impossible to realize the flavor of his testimony without reading it in full. He was abusive, and on occasion, even profane. He stated in unequivocal terms, more than once, that the only reason he was present was to get back the fee he paid Solomon.

In view of the prevalence of immigration frauds, Solomon's stated reason for withholding the filing of a visa petition until his doubts about the bona fides of Georges' marriage were resolved, is credible. Solomon was an experienced immigration practitioner. Several unsuccessful efforts to contact the wife, and the lack of cooperation of his clients, could easily have triggered a reluctance to go ahead until he was satisfied. Apparently, he had not yet resolved the question in his own mind by the time Georges went to the Service as the result of adverse newspaper publicity about Solomon. The overall period involved was not that great, and has not been shown to amount to a wilful deception as charged (c.f. Charge 6 below). That the petition was ultimately approved by the Service when Georges obtained other counsel is not determinative. The issue is Solomon's state of mind when *he* handled the petition.

Georges is an unconvincing witness. His wife, who allegedly had personal knowledge of the facts, and who could perhaps have tipped the scales, could have been put on the stand by the Government.[2] She was not, on the apparent assumption, despite Solomon's contradiction of Georges' testimony, that the charge had been satisfactorily established, and that it was up to Solomon to call her as a witness. This was an erroneous assumption in my opinion, and a fatal one so far as this charge is concerned. I therefore concur that the clear, convincing, and unequivocal burden has not been met as to Georges.

### Charge 4

Charge No. 4 relating to the Zuninos, is more troublesome. Solomon

---

[2] She was not available at the time Georges testified, allegedly because of ill health. According to a statement made by the Government trial attorney she was available at a later stage of the proceedings.

denied flatly that he assured them that they had pending applications for immigrant visas at the American Consulate in Toronto. His testimony was that there was no basis whatsoever on which to file such an application. They had no labor certifications, no possibility of getting any, and no exemption from the requirement. There was no United States citizen child or spouse, as in the other cases. It is clear that they had no chance whatsoever of achieving permanent residence.

To an extent, Solomon's testimony was corroborated by Mrs. Zunino who stated that she showed Solomon a letter of recommendation from her employer to help her get a labor certification, that Solomon read it and returned it to her, apparently because the nature of her work was not in a category to warrant processing for the purpose of clearance. In itself this would appear to have been some notice to the Zuninos that there was a substantial impediment to obtaining permanent residence in this country. Moreover, I do not believe Solomon would have rejected the letter, or given the advice he did, had he been bent on deliberate deceit as claimed. While Zunino testified that he turned over immigration documents to Solomon for processing a visa, his wife stated that she was not present when this happened, and hence she could not corroborate it.

However, notwithstanding this manifest ineligibility for a visa, the record is uncontradicted that Solomon requested a fee of $500, and that a fee of $250 was actually paid in October 1970. While Solomon is not charged with receiving excessive fees, the amount of the fee is still significant in two respects, in my opinion. The first is with respect to credibility. The greater the legal service promised or performed, the larger the fee to be expected. If Solomon held out the promise of lawful permanent residence, one would normally expect him to charge more than if he agreed merely to consult, and to represent to some lesser extent. In a very general way, a larger fee would tend to corroborate Zunino's testimony; a lesser fee, that of Solomon. Second, the fee paid bears on the allegation of detriment to the alien—assuming a material misrepresentation. As to the Zuninos, so far as the record shows, the *only* detriment they could have suffered as a result of a misrepresentation by Solomon, would be in having paid a needless or irrational fee. In my opinion Solomon would be within the proscription of 8 C.F.R. 292.3(a)(4) if he made misrepresentations to the Zuninos with respect to their immigration status, and thereby induced them to pay a fee in no way commensurate with the services performed.

This is a nebulous area. It should be approached only on the basis of a great deal more evidence than we have in this record, respecting the range of immigration fees generally, and the adequacy of services performed within that range. Five hundred dollars is consistent with the fee set by Solomon for obtaining permanent residence in other cases

(See, for example, Olivares, T. Part IV, P. 8). On the other hand, in return for the $250 actually paid, the Zuninos consulted with Solomon several times over a two-year period, while faced with possible deportation. Mrs. Zunino appears to have received advice concerning a possible labor certification. Zunino himself, when he received a call-in letter in May of 1972, arranged with Solomon to appear with him at the Immigration and Naturalization Service office to surrender. He did meet Solomon in the Miami office and at that time was fingerprinted and photographed.[3] These were services performed, and in the complete absence of evidence to the contrary one cannot find they were so irrationally disproportionate to the fee paid, as to substantiate, by the requisite burden of proof, the allegations of deception and detriment as charged. For this reason, as well as the lack of overall credibility of the complaining witnesses, I concur that this charge has not been sustained.

### Charges 5 and 7

For the reasons stated in the main opinion I concur in the finding that neither of these charges has been satisfactorily established. Even assuming that Solomon improperly kept a Form I-94 in his own possession (Charge 5), while this might be the basis for a criminal charge under 8 C.F.R. 1304(e) and 18 U.S.C. 2 in some circumstances, (*United States* v. *Abrams*, 427 F.2d 86, 2 Cir. 1970), it was not a misrepresentation to an officer of the Immigration and Naturalization Service within the meaning of 8 C.F.R. 292.3(a)(4).

Similarly, a direction to an alien not to report in response to an official communication, might well be reprehensible and improper conduct, but it, too, is not within the proscription of the specific charge.

### Charge 6

Charge 6 is a different matter. Hidalgo is a native of Colombia who was married to a United States citizen. A visa petition was filed by Solomon and it was approved on February 18, 1972. It was forwarded to the consulate in Toronto and received February 28, 1972. Up to this point, Solomon, who had also represented Hidalgo at a deportation hearing, acted properly.

Form F. S. 499—Hidalgo's control card at Toronto (see Ex. 26) is noted to show a consulate response to the application on March 8, 1972. The next notation appearing chronologically on the card is dated July 17,

---

[3] As of the date he terminated his relationship with Solomon—indeed as of the date of the hearing, he and his family were still in the United States and may even still be here, albeit at the sufferance of the Service. Under the recently enacted Western Hemisphere Act (PL. 94-571), as of January 1, 1977, Zunino and the other complainants might conceivably qualify for adjustment in the United States—a relief previously not available to them.

415

1973, over 16 months later, and indicates that "PKT 3" was sent by the consulate. Hidalgo never did receive a visa as a result of this visa petition.[4] There is no explanation what, if anything, was done by Solomon between March 1972, and July 1973 or thereafter, to further the application. The record is silent as to exactly when his relationship with Hidalgo ceased, but there is no question that as of March 1973, a full year after the original submission, Solomon was still representing him.

Solomon undertook to obtain permanent residence for Hidalgo with reasonable diligence. No impediment to obtaining permanent residence is shown in the record. Most certainly Solomon has not shown any, despite the obvious burden thrown on him. There was no labor certification required. The petition had been approved for immediate relative status as the spouse of a citizen. The normal waiting period for Western Hemisphere applicants was not involved, since Hidalgo was married to a United States citizen. The Form F. S. 499 indicates that, at worst, Hidalgo might have needed permission to reapply for admission after a deportation order, in order to achieve the goal. Yet Solomon has not shown that he took any steps beyond the initial submission, to secure permanent residence for Hidalgo.

It is not known if permission to reapply *was* needed—a further notation on the Form F. S. 499 would indicate it was not—but even if it were, Solomon should have taken action to secure that permission from the District Director. In March 1972 the consulate undoubtedly sent back additional forms to be executed. (See Ex. 29). If so, it was incumbent on Solomon to see to their execution and prompt submission. On the record before us, this was not done.

Solomon did not obtain permanent residence for his client despite his representation that he would do so, and despite the absence of any impediment. If he had any explanation we must assume that, as an attorney faced with these charges, he would have offered it. It must be concluded that there is no explanation, and that his failure to act was either deliberate, or so grossly negligent on the part of a member of the bar as to amount to the same thing. Because of his nonfeasance his client suffered a serious and wholly unnecessary delay in obtaining permanent residence.[5] I, therefore, concur that he wilfully failed to obtain permanent residence for Hidalgo and that Hidalgo thereby suffered a detriment. That he properly represented Hidalgo at the deportation hearing, securing a substantial grant of voluntary time, and did file a visa petition

---

[4] He separated from the petitioner in April 1974 and on January 31, 1975, married another United States citizen. References to a second visa petition would indicate one was filed after that.

[5] The gravity of this delay is brought home when it is realized, apart from other considerations, that the residence period for naturalization begins only with the acquisition of lawful permanent residence (8 U.S.C. 1430).

416

for him, are mitigating factors. I, therefore, concur in suspension for this violation for a six-month period.

*DISSENTING OPINION:* Louis P. Maniatis, Board Member

It appears that the determinations of both the majority and concurring opinions are based on the standard of proof that is clear, convincing, and unequivocal evidence as announced in *Matter of Koden,* Interim Decision 2516 (BIA 1974; A.G. 1976; BIA 1976). I take issue with the standard applied in this case.

In my view, there is a marked difference between the facts in *Koden,* supra, and the facts in the instant case. *Koden, supra,* was acting as a representative of an accredited organization, which had been qualified by this Board pursuant to regulations, to appear in behalf of individuals who applied to such organization for legal assistance on immigration matters. There was no direct attorney-client relationship, as such, in *Koden,* supra, as there is in the instant case. In the present circumstances a different standard of evaluation is required, which, in my opinion, is the preponderance of the evidence. It is one that requires a higher degree of accountability and responsibility of an attorney to his client. Hence my dissent. I may add, however, that the Service has established its case by clear, convincing, and unequivocal evidence.

An attorney must not only exercise reasonable care and diligence and possess the legal skill and knowledge ordinarily possessed by members of the profession, but he is also bound to conduct himself as a fiduciary occupying a position of the highest trust and confidence. It is his duty to exercise the utmost honesty, good faith, fairness, integrity, and fidelity. To me, the main issue of this case is whether the respondent met this standard.

Both the majority and concurring opinions refer to the seemingly contradictory testimony and evidence adduced during the hearing and conclude that seven complaining witnesses, who were clients of the respondent, appearing in behalf of the Service, did not overcome the blanket denials made by respondent. The respondent presented no corroboration of any sort, such as record files, memoranda as to actions taken, cash ledgers to indicate amount of fees received, copies of correspondence or even letters received or copies of forms. On the other hand, the record reflects that the Service had amply met its burden.

In addition, much is made of the alleged discrepancies in the testimony of the Service witnesses, and as described in the concurring opinion, "the homogeneous quality of the testimony of the Chilean complainants is disturbing." What is overlooked by the majority is that we have other than Chilean complainants whose testimony was of similar, substantial, and probative nature.

We are dealing with aliens seeking counsel, advice, and professional services of an attorney learned in immigration law. These aliens had a right to rely on respondent's competence and assurances "that everything was all right and not to worry," as admitted by respondent. I submit that they misplaced their trust and confidence in the respondent as an attorney.

The concurring opinion apparently finds that the respondent is a sole practitioner, with no secretary (despite the record testimony that there was always one other person assisting respondent and acting as interpreter in all these cases), that his office is located in his home, and there is some excuse in the lack of supporting documentation, and that he only had copies of forms filed in various places. It seems to me that because of these circumstances he would be meticulous and orderly in his handling of cases. The various copies of forms or correspondence were not produced to substantiate his claim as proof of the type of services, together with the results of his professional services rendered on their behalf.

Comment is also made in the concurring opinion that the fees charged were nominal, and at least the complainants gained time when they had no particular equities in their favor, and they suffered no detriment. I cannot accept such rationale as justification for respondent's conduct as a professional. Professional ethics requires that a lawyer should represent a client competently and his failure to handle a legal matter without preparation adequate in the circumstances and to neglect a legal matter entrusted to him subjects him to disciplinary action.

An attorney has the duty to execute the matters entrusted to him with a high degree of care, skill, and dispatch. This, in my opinion, respondent failed to do. In my judgment there is sufficient and compelling evidence, which justifies suspension of the respondent for a minimum of at least two years.

*Before the Attorney General on Review*
November 10, 1977

This matter is before me for review pursuant to § 292.3(b) of Title 8 of the Code of Federal Regulations relating to the suspension or disbarment of attorneys and representatives of accredited organizations from practice before the Immigration and Naturalization Service and the Board of Immigration Appeals. Respondent is an attorney who has been admitted to practice in several courts. His practice includes cases before the Service and the Board.

The Service commenced a proceeding under 8 C.F.R. §292.3(a) seeking the disbarment of respondent on a number of grounds. After an evidentiary hearing before the Service, it recommended disbarment and

forwarded the matter to the Board for decision as required by the regulation. The Board, with one member dissenting, sustained one of the charges and ordered respondent's suspension from practice for a period of six months.* The regulation further provides that a disciplinary order must be referred to the Attorney General for final determination. For the reasons set forth below, the Board's order is affirmed.

I find that the Board correctly weighed the evidence adduced in support of the Service's allegations of misconduct against the standard articulated in *Matter of Koden*, (BIA 1974; A.G. 1976; BIA 1976). That case set forth the quantum of proof in disbarment proceedings under 8 C.F.R. §292.3 to require that evidence supporting allegations of misconduct must be clear, convincing and unequivocal. I concur in the Board's decision that the Service only met its burden of proof with respect to one of the grounds alleged in charge six.

The ground involved alleges a violation of 8 C.F.R. §292.3(a)(4). Section (a)(4) provides that disciplinary action is in the public interest against an attorney practicing before the Service or Board—

(4) Who willfully deceives, misleads, or threatens any party to a case concerning any matter relating to the case."

The evidence establishes that the respondent was retained by an alien named Hidalgo-Caicedo to represent him in deportation proceedings, which he did in January of 1972. The result of the proceeding was the entry of a deportation order with the condition that Mr. Hidalgo might, however, voluntarily depart from the United States within six months. Hidalgo, however, had a United States citizen wife living in the United States. Under the Immigration and Nationality Act, §201(b), 8 U.S.C. §1151(b), he was entitled to apply for an immigration visa as an "immediate relative" of a United States citizen. He then retained respondent for that purpose, and respondent filed the necessary petition with the Service, which petition was approved. The approved petition was then forwarded to the appropriate United States consul in Canada for processing. The respondent did not, however, take the needed steps with the consul for issuance of the immigration visa, although he told Hidalgo that he had done so. The outcome was the issuance of a final order of deportation against Hidalgo. As to this the Board states (Decision at 23) that respondent's "failure to take any further action on the

---

* I have been informed that subsequent to the date of the Board's order respondent was convicted in a Federal court of the felony of filing a false petition in an immigration proceeding. The conviction has been appealed. Although 8 C.F.R. §292.3(a)(13) provides that conviction of a felony is a basis for disciplinary proceedings, the Service takes the position that the conviction must be final. The dissenting member believed that the Board had acted too leniently both as to other charges and the length of the suspension.

visa application for more than a year without explanation . . ., while assuring his client that everything was in order for him to receive an immigrant visa, had the effect of misleading and deceiving Mr. Hidalgo." Accordingly, the Board concluded that the charge under §292.3(a)(4) has been sustained.

For that charge to be sustained it had to be established that respondent had willfully misled and deceived Mr. Hidalgo as to "any matter relating to the case." The case here was the deportation proceeding against Mr. Hidalgo. There are two matters relating to the case; the application for an immigration visa and the respondent's advice to Mr. Hidalgo to ignore the Service's call-in letters. If respondent had not told Mr. Hidalgo to ignore the letters and then failed to represent him before the Service in answer to them, presumably, Mr. Hidalgo would not have been ordered to report for deportation in March of 1973. And if respondent had taken the necessary steps in connection with the application, presumably, Mr. Hidalo would have succeeded in obtaining an immigration visa and the deportation proceeding would have been terminated.

*Ordered* that respondent be and he hereby is suspended from practice before the Immigration and Naturalization Service and the Board of Immigration Appeals for the period of six months from the date of service on him by the Board of this decision.